Dear Cecilia Januszkiewicz
You have asked for our opinion about the expenditure of State funds in connection with the National Baptist Congress of Christian Education, a convention to be held next month in Baltimore. You have requested this opinion to comply with a restriction in the budget bill that conditioned the expenditure of funds appropriated for that purpose on an opinion from the Attorney General that the funding is constitutional. You have indicated that the funds will be used for transportation services and have also provided certain information about the controls that will be placed on the use of the funds.
In our opinion, it is possible for the State to expend the appropriation without offending the Establishment Clause. In particular, funds may be expended for the specific purpose you have identified — transportation services — under a grant agreement that restricts the use of the funds and imposes appropriate controls. This Office is available to review the constitutionality of other proposed uses of the funds with your staff and other State officials and to supplement this opinion as necessary.
 I Background
A. Budget Condition
During the 2006 Session of the General Assembly, the Governor submitted a supplemental budget that included a deficiency appropriation of $150,000 for Fiscal Year 2006 for the Office of Tourism Development of the Department of Business and Economic Development for the following purpose: "to provide funds for the National Congress of Christian Education to be held in Baltimore on June 19-23, 2006." Chapter 216, Laws of Maryland 2006, Item 10 in second supplemental budget amending program T00G00.02. The General Assembly placed the following condition on the appropriation: "provided that these funds are contingent upon an opinion from the Office of the Attorney General confirming that the funding is constitutional." Id.
To comply with the budget condition, you have requested an opinion concerning the constitutionality of this appropriation.[1]
B. Proposed Expenditures
Founded in 1886, the National Baptist Convention USA, Inc. ("Convention")[2] states that it is the nation's oldest and largest African American religious organization, with an estimated membership of 7.5 million individuals. See www.nationalbaptist.com. Among other things, the Convention holds its major educational conference, called the National Baptist Congress of Christian Education ("NBCCE"), each year during the third week of June. Id. It is the largest of the four annual national meetings of the Convention; in contrast to some of the other annual meetings, attendees at the NBCCE may or may not belong to the Convention or to churches that are members of the Convention. Id.
You state that the 2006 NBCCE will be the largest convention that the State of Maryland has ever hosted. It is expected that 50,000 people will attend its meetings at the Baltimore Convention Center and other sites. This will be the first time that the entire Baltimore Convention Center will be used by a single group. Given the size of the convention, attendees will have to be housed at various locations throughout the region.
You state that NBCCE is a significant tourism development opportunity for the State because the attendees will not only occupy thousands of hotel rooms in the region but also "visit Maryland tourist attractions, dine in Maryland restaurants and shop in Maryland stores." You indicate that a successful convention of this size will generate visitor-related expenditures of more than $40 million.
You state that the appropriated funds will be used in part to support "the transportation costs of safely and efficiently moving 50,000 people throughout the region." According to your letter, the State Department of Business and Economic Development will assign two staff members to the convention to promote Maryland and to ensure that the funds are properly utilized. In addition, the funds will be provided pursuant to a standard grant agreement that will limit the use of the funds to the permitted uses and will require documentation of expenditures.
 II Analysis
A. Constitutional Test
The constitutional question raised by the budget condition is whether the appropriation of State funds for a convention of a religious organization offends the Establishment Clause of the federal constitution.[3] To assess whether such government aid is constitutional, the courts apply an analysis first developed by the Supreme Court in Lemon v. Kurtzman,403 U.S. 602 (1971) and later modified in Agostini v. Felton,521 U.S. 203 (1997). Under this approach, a court first determines whether the program has a secular purpose. The court then looks to whether the program has the effect of advancing religion.Agostini, 521 U.S. at 234. To determine whether government aid has the effect of advancing religion, courts consider whether the aid program: (1) results in governmental indoctrination; (2) defines its recipients by reference to religion; or (3) creates an excessive entanglement with religion. Id. These criteria would apply to the assessment of a grant to a religious or faith-based organization. See 88 Opinions of the AttorneyGeneral ___ (2003) [Opinion No. 03-017 (October 27, 2003)].
In some contexts, a court may also inquire into whether the organization or institution that is receiving the aid is "pervasively sectarian." However, the Supreme Court has downplayed the significance of that criterion in its recent decisions and has placed greater emphasis on whether the aid is for a secular purpose and is distributed on the basis of neutral criteria that do not favor religious institutions. See Mitchellv. Helms, 530 U.S. 793 (2000); see also 88 Opinions of theAttorney General ___ (2003) [Opinion No. 03-006 (March 17, 2003)].
B. Whether the Aid Has a Secular Purpose
The NBCCE will swell the population of the Baltimore region by 50,000 people during one week in June. The convention can thus be expected to strain the public services that local and State government normally provide for both residents and visitors, such as transportation, sanitation, and security. Supplementing the existing public assets that support such services in order to cope with a substantial, though temporary, increase in the demand for those services is surely a secular purpose.
In addition, as you have outlined in your letters requesting this opinion, the potential economic benefits to the State are significant if, as you indicate, visitors are expected to inject $40 million into the local economy during a brief period. The region's success in managing the challenges to public services posed by such a large convention may help attract other conventions of equal magnitude, with similar positive effects on the local economy. The appropriation may also serve this secular purpose.
C. Whether the Aid Has the Effect of Advancing Religion
"[S]pecial Establishment Clause dangers exist when money is given to religious . . . entities directly rather than . . . indirectly." Mitchell, 530 U.S. at 818-19 (Thomas, J.). Grant funds received directly from the government may not be used for the purpose of conducting religious activities. See
88 Opinions of the Attorney General ___ (2003) [Opinion No. 03-017 (October 27, 2003)]. Thus, in order to assess whether the aid has the effect of advancing religion, one must analyze the intended use of the government aid.
For example, in Gilfillan v. City of Philadelphia,637 F.2d 924 (3d Cir. 1980), cert. denied, 451 U.S. 987 (1981), the Third Circuit held that the expenditure of city funds to construct a platform in a public park in Philadelphia in connection with a papal visit and mass violated the Establishment Clause. The court noted that the use of the platform for a liturgical service rendered the religious effect of the aid "both plain and primary." 637 F.2d at 931. By contrast, in O'Hair v.Andrus, 613 F.2d 931 (D.C. Cir. 1979), the District of Columbia Circuit held that government expenditures for a similar papal visit to Washington, D.C., did not violate the Establishment Clause. In that case, the expenditures were for police, sanitation, and utilities on the National Mall. The court noted that similar services would be provided for any large gathering on the Mall, regardless of whether the attendees were adherents of a particular religion, and that the church had financed the construction of a platform for the religious service.613 F.2d at 934-35. The court concluded that "[p]rovision of police, sanitation and related public services is a legitimate function of government and not an `establishment' of religion." Id.
at 936.
You have indicated that at least part of the State funds will be used to provide transportation services for the visitors to the convention. The provision of transportation services may ensure that convention visitors will reach their destination more quickly and more safely, but it cannot be characterized as governmental indoctrination any more than other subsidized public transportation systems that allow residents and visitors to attend religious services.[4] Nor does the provision of such services "creat[e] a financial incentive to undertake religious indoctrination." Agostini, 521 U.S. at 231.
The transportation services will be provided to convention visitors, many of whom, given the nature of the convention, are likely to be members of a particular religious denomination. However, access to subsidized transportation services is not restricted to members of a particular sect. Your letter indicates that similar aid would be offered to any convention of similar size and economic impact which, due to its size, was forced to lodge attendees throughout the metropolitan area.[5] SeeMitchell v. Helms, 530 U.S. 793, 809 (2000) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination . . . has been done at the behest of the government.").
Finally, given that the funds will be used to provide a service analogous to public transportation services, there should be little possibility for excessive entanglement of the religious aspects of the convention and the State aid. You have stated that the State will ensure that the funds will be used for the intended purpose by requiring the NBCCE to enter into a grant agreement that restricts the use of the funds to specific secular purposes and that requires provision of receipts and other documentation demonstrating compliance with the grant's terms.See Bowen v. Kendrick, 487 U.S. 589, 614-16 (1988) (even though federal statute lacked provision explicitly limiting government grants to secular purposes, grants to religious organizations under that law would not necessarily advance religion as use of grants could be monitored without excessive entanglement of government and religious organizations).
In our view, such aid is not unlike the basic public services provided for the papal visit that the D.C. Circuit found acceptable in O'Hair v. Andrus. It is also notable that the Supreme Court has long approved the use of government funds to provide transportation services for students attending religious-affiliated schools. Everson v. Board of Education,330 U.S. 1 (1947).
 III Conclusion
In our opinion, it is possible for the State to expend the appropriation without offending the Establishment Clause. In particular, funds may be expended for the specific purpose you have identified — transportation services — under a grant agreement that restricts the use of the funds and imposes appropriate controls.
You have asked for guidance on other permissible uses of the appropriated funds. Because we are not involved in the arrangements for this convention and do not know the precise impact it will have on local services, we cannot speculate as to suitable uses of the State aid appropriated in the budget bill. This Office is available to review the constitutionality of other proposed uses of the funds with your staff and other State officials and to supplement this opinion as necessary.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] You initially requested the opinion on May 4, 2006, but did not include information concerning how the funds would be spent other than that they would be for "secular services and purposes." On May 5, 2006, we requested additional information concerning the criteria under which this particular convention was selected for a subsidy, how the appropriation would actually be spent, and what controls would be employed to ensure that the funds were used for specified purposes. You responded on May 19, 2006, with the information outlined in the text.
[2] In this opinion we use the capitalized term "Convention" to refer to the religious organization and the lower case "convention" to refer to its meeting in Baltimore.
[3] The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."United States Constitution, First Amendment. The First Amendment applies to the states through theFourteenth Amendment to the federal constitution. See Everson v. Board of Education, 330 U.S. 1, 8
(1947).
[4] Of course, as noted above, State funds may not be used for the purpose of conducting religious activities. For example, a vehicle used to transport attendees and supported by a State subsidy could not itself be a venue for religious services or organized proselytization.
[5] In a prior opinion we cautioned that "the funding of a single faith-based organization, presumably selected by the government, would raise issues of government endorsement of one religious group." 88 Opinions of the Attorney General ___ (2003) [Opinion No. 03-017 (October 27, 2003)] slip op. at p. 9. *Page 132